## WILLIAM NIVIN, use of FRANCES J. CLING *vs.* REBECCA STEVENS.

The City Regulators of Wilmington have not power to adjudge questions of title between adjoining lot holders.

In a second action for a continued trespass, the former verdict and judgment is evidence, but not conclusive, of title.

The courses and distances of a deed may be controlled by the holdings, where there are visible lines marked by permanent and enduring objects, such as walls, fences, &c., existing at the time of the conveyance; and with such references as may apply to the property itself as then being.

Measure of damages for a continued trespass.

TRESPASS quare clausum fregit, for damages to real property in the city of Wilmington.

Miss Cling and Mrs. Stevens were owners of adjoining lots on Market street, with buildings on each, and the object of the suit was to settle the dividing line. The defendant, being about to rebuild her house, called out the city regulators, by whose measurement, the plaintiff's house was found to be several inches over the line, and which was cut away to that extent; for which trespass this suit was brought.

After evidence of title on both sides had been put in, the defen-

dant offered in evidence the certificate of William H. Jones and A. W. Smith, city regulators, stating that they had regulated the front and the south side line of Mrs. R. Stephens' lot in Market street (east side) between Fourth and Fifth streets, marking the said side or boundary line (between the lot of Mrs. Stevens and that of Miss Cling) parallel with Fifth street, and at the distance of forty-four feet and seven inches from the south side of Fifth street, and decided the true dividing line between said properties.

*Mr. Bayard.*—It is a mere ex parte proceeding, made at the instance of one party, on her papers, now offered to decide the legal right of property. The city regulators have no such power. Their power is to regulate the walls " as to breadth or thickness thereof" according to known or acknowledged lines and not to decide the lines. It is a mere police arrangement to see that houses are properly built in reference to the line of the streets, and the gutters; and the width of party walls, as between the parties, or other walls with reference to the public safety. These regulators seem to have repudiated almost the only power which they had; for they did what they could not do, and left undone what they were bound to do.

*Mr. Patterson.*—These certificates show the measurements of the city regulators, according to which the wall was built. They are certificates from legally constituted officers and are evidence of the object of such regulations. What are these objects? To prevent irregularities and controversies relating to foundations and party walls, a power necessary to be exercised summarily, especially in a city. If every controversy of the kind must abide delay of suits at law, it would constantly stop improvement. The jurisdiction of these matters has been properly vested in the city regulators, with an appeal to the City Council. The fact that no such cases have been heretofore in this court, is evidence that these matters have been lawfully settled elsewhere.

It is no answer to such a law that it is unwise. That is for the legislature. But it is a wise law—absolutely necessary in cities. Even the error, if so common as this, would make the law. If this general construction given to the act should be restricted to the mere width of party walls, it would repeal the law; whereas the rule is to construe a remedial law so as to extend the remedy. It is against the gramatical construction of the law.

When a power is granted to a municipal corporation, all the incidents necessary to execute it are granted. The power to fix the

foundation, and regulate party walls includes the necessity of de-ciding where the lines are. If they have nothing to do but decide on the thickness of the walls, why go on the premises.

§ 7. Penalty for building contrary to regulation.

It is not an ex parte proceeding. The regulators call for papers from both parties. There is an appeal; and full hearing may be had.

*Mr. Bayard.*—It might as well be contended that the fence viewers have the power to decide the title to land by regulating party fences, as to claim the power now claimed for city regulators. That a power to regulate party walls shall by inference embrace a power to determine titles, and dividing lines, and a municipal authority shall oust the Superior Court of jurisdiction and exclude trial by jury, is a monstrous proposition, and all this without any provision for notice, or for trial, or for evidence, or for deliberation. Two men, called out by one party, and paid by him, shall, from his papers, decide upon the title to my land. The authority given by law is not to settle boundaries, or titles, but to settle party walls or *undisputed lines*, when disputes arise about the necessary width of party walls and foundations, and the part of the walls on each side. If such a power is to be recognized what is to be the effect? Take the present case as an illustration. Here are two houses standing for fifty years on a certain line; regulated no doubt at the time they were built; and now regulated again at the instance and by the papers of one party, and fourteen inches cut off from one of the houses. What is to prevent the next set of regulators from cutting off more, or cutting off less; and from thus pulling down houses every year. No record is made, and if made the act of regulators to-day, cannot bind others to-morrow, though an effect is claimed for it to control the legal rights of parties without hearing, trial, or judgment. If the legislature designed to give this dangerous power to regulators, they would have said so directly.

*By the Court.*—If these certificates are offered in order to show the decision of the regulators as to boundaries or location of lines they are not evidence. No such authority is given to these officers; nor even to the city council, nor to the city courts.

The powers conferred on the city regulators are contained in the act of assembly of June 13, 1772. It is the power to regulate streets and party walls.

Section 7 imposes a penalty for building without regulation; and

section 8 provides for an appeal from the order and direction of the regulators to the city council.

In our opinion this act does not confer the power which is claimed for the regulators in this case, of deciding the legal titles of the parties in a *disputed* line of property.

This opinion though clear and undoubted in itself, is strengthened by the fact that the law of 1832, which gives the city court jurisdiction in all cases of assumpsit, debt, covenant, trover, replevin and trespass, expressly refuses to allow that court to decide questions of title to real estate.

It is very apparent that in many cases such a power could not be exercised by the regulators, however intelligent and proper they may be for their office, with safety and justice, for want of the proper information, and exhibition of the titles of the respective parties. The lines of a party do not necessarily depend on a measurement of feet and inches from a given point; such measurement may often be controlled by the holding of the parties; by divisions among former owners, and by many other facts as well as principles of law, equally important in the settlement of titles to real property as the mere description of courses and distances in a deed.

This new power claimed for the city regulators is so extensive in its bearing on the legal rights of property-holders in Wilmington, that the court will be extremely cautious before they recognize it to exist, and would require the grant of such power by the legislature to be extremely plain and positive. In all other parts of the State, a party cannot be deprived of his real property without a formal trial of his title before a court and jury, by the examination of witnesses and scrutiny of all the title papers of both sides; but this claim of power in the regulators is to settle the legal title of property by a mere measurement not necessarily with notice to the other party or examination of his title papers, and always without the aid of a court as to the law, or the verdict of a jury on the facts.

The plaintiff had a verdict; and the defendant's wall being suffered to remain; another action was afterwards brought for the continuing trespass.

The regulators' certificate was offered in evidence again in that case, in mitigation of the damages, and objected to.

*Mr. Bayard.*—It was decided at the former trial that the regulators had no right to determine questions of title to real property

by the regulation of party walls ; the counsel even admits that such decision was not capable of being controverted ; and yet the same species of evidence is offered to mitigate the damages. Neither is this action for any thing connected with the original location of this wall, about which I have offered no evidence, but it is for an injury arising from the wall remaining there in defiance of that verdict and judgment.

*Mr. Rogers.*—If I differed from the court on any point decided in the former case, it would be my privilege and my duty to revive and re-argue such point in this case, and respectfully ask the court to re-consider that opinion. On the main point, I have expressed my entire concurrence with the ruling of the court. I never had a doubt of it. But I offer the proof of the action of the regulators in this matter in mitigation of the damages. The court has never rejected the evidence for any such purpose ; but only as legally fixing the title of the parties. The evidence is also admissible in reply to the testimony already given by the plaintiff, of the original trespass.

*Mr. Bayard.*—I concede that matters connected with the trespass may be given in evidence in aggravation or mitigation of damages ; but the trespass here complained of is not the erection but the continuance of the wall; and the testimony now offered is connected with the former, not with the latter trespass. The object of the evidence is to show that the plaintiff is not entitled to damages for the erection of this wall, or to but nominal damages, *because* before erecting the wall the defendant consulted the city regulators ; yet all that was *decided* in the former suit; and this action is for a subsequent trespass, in continuing the wall. If such evidence is admitted, evidence would also be admitted in reply that we gave written notice to the defendant not to proceed to put up the wall.

*The Court* excluded the evidence.

*Mr. Rogers,* for the defendant, remarked on the hardship of repeated suits brought against his client for the same trespass.

He maintained that the defendant, in placing her wall upon property which, according to the measurement from Fifth street, and the distance called for by the deeds, was rightfully hers, was no trespasser ; and that if from any technical rule of law she was made a trespasser, she would not be liable to other than nominal damages, as she placed her walls where they are by direction of the city regulators. He admitted that the regulators had no right to settle a

disputed title to land, but their action should protect a party who relied on them in good faith, from damage.

He re-argued and asked the court to review the decision made in the former case, giving the preference to visible lines of boundary over course and distance, as called for by the title papers. He admitted the correctness of the rule as to monuments of boundary mentioned as monuments in the title papers, but controverted it in application to the location of houses, walls or fences. He argued, that supposing these houses to have existed in the time of Judge Way, the former owner on the lines of division as claimed by the plaintiff, the commissioners having to divide it by order of the Orphans' Court could establish other lines, and their return is the proper evidence of the division made by them. The return in this case describes the lots by course and distance, and makes no mention of the houses which are now relied on as evidence of the lines, against the return itself. The law makes that return conclusive, to remain "firm and stable forever," yet the purpose to which the legal principle is now applied, is to change and alter that return by locating these lines differently.

In regard to the effect of the former recovery between these parties, he said the question was an unsettled one in the courts of this country. He deplored the frequent departure of the courts in this country from the principles of the common law, and said there was scarcely any position, however strange, that could not find sanction by the decision of some court in this country. The common law principle is, that no former recovery can be conclusive unless pleaded as an estoppel.

*Mr. Bayard* replied.—(3 *East Rep.*, 346; *Doyle* and *Smith*.)

*Judge* HARRINGTON charged the jury.

He said that the case being somewhat involved by facts, some of them apparently conflicting, it would be necessary for him to go into detail to show the application of certain legal principles, upon which the court were to instruct them.

There had been a former suit between these parties. That was against this defendant for a trespass in erecting a wall on the plaintiff's property; this was for a further trespass in continuing that wall so unlawfully erected. The record of that former suit had been given in evidence, and was relied on by the plaintiff not only as strong, but as conclusive evidence of the title. The first question, therefore, which arose in the cause, was as to the effect of that for-

mer recovery, and that was a question of law, in relation to which the court expressed the opinion that the record was not absolutely conclusive in this second action of trespass between the same parties, but that it was pregnant and strong evidence of the plaintiff's title to the place where the trespass was alledged to be done. This point had been heretofore ruled by the court in the case of *Hudson* against *Dazey*, in a second action of ejectment; and also, he thought, in a prior case of *Stean* against *Anderson*, in a second action of trespass.

The jury therefore were at liberty to determine all questions in this case as well of title as of trespass, and damages; taking with them the record evidence of a former recovery between these parties as persuasive evidence of the plaintiff's title.

Both parties claimed title to the small strip of land on which the trespass was committed; the plaintiff as a tenant of Frances J. Cling, who claims under a deed from Joseph Hemphill, who bought of William W. Thomas and wife, James B. Thomas and Benjamin P. Phister and wife, the heirs-at-law of John Way.

The defendant, Mrs. Stevens, claimed title also from these same heirs of John Way, by deed subsequent to the grant to Hemphill.

Both properties lie on Market street, between Fourth and Fifth streets, and originally all belonged to John Way, under a conveyance referring to Fifth and Queen streets, and locating a certain number of feet and inches from the southern side of said street, running parallel therewith, and giving fronts of twenty feet seven inches, and twenty feet respectively.

Referring to the deed of Miss Cling, the description is: "a lot or piece of land with a two story frame dwelling house and other buildings and improvements *thereon*, situate on the eastern side of Market street, between Fourth and Fifth streets, in the city of Wilmington aforesaid, and bounded as follows: beginning at a corner of lot No. 1, (of this part) on the said side of Market street, at the distance of forty-four feet seven inches from the southern side of Fifth (late Queen street,) thence south fifty-eight degrees east eighty-five feet three inches; thence south thirty-two degrees west twenty feet; thence *with Hemphill's lot parallel* with the first line *and with Fifth street* to Market street, and thence to the beginning."

The defendant had shown by the evidence that they measured forty-four feet seven inches from the south side of Fifth street, and that this came in front upon Miss Cling's house fourteen inches; and running through her house by a parallel with Fifth street, that it

took off from the plaintiff's house a strip varying from fourteen inches in front to five or seven inches back; being the disputed strip which defendant took possession of as her property, under a claim of right and built her house upon it.

In the former case this measurement having been shown to have been made by the city regulators, it was relied on as an entire justification. The court decided against the power of the regulators, and that question had not been revived in this suit.

In this case it was alledged on the part of the plaintiff that the title to the land in dispute depends upon a principle of law, and a matter of fact, independent of the actual distance which the deed calls for from Fifth street, as measured by the city regulators. The matter of fact was this, the house and lot of Miss Cling had been held by a distinct, visible and tangible line of occupancy, defined by walls of stone or wood for more than forty years; and the principle of law was, that inasmuch as this lot was assigned in the Orphans' Court to heirs of John Way, by these defined and certain limits *as well as by* course and distance, and was conveyed in *the same way* by these heirs to John Hemphill, and by him to Cling, *before* the same heirs conveyed the adjoining lot to Mrs. Stevens, both her deed and Miss Cling's had reference to this holding as well as to the course and distance.

The two lots belonged to the same persons and were assigned in the Orphans' Court in the year 1834. In these proceedings the portion of Mr. Way's real estate marked in the return C. No. 1, 2 and 3, and valued at $5,200, was assigned to Benjamin Phister and wife, William W. Thomas and James R. Thomas, by the following discription:—

"Part C. No. 1, whereof is a lot of land situate in the city of Wilmington aforesaid, bounded on the north by part B., on the south by lot No. 2, next described, having a front of twenty feet seven inches on the easterly side of Market street and extending back or eastwardly at that width eighty-two feet three inches to the westerly side of the three feet wide alley before mentioned, and having a three storied brick dwelling house and other buildings and improvements *thereon*, with the right and privilege attached to said lot of the use in common of the aforesaid alley. No. 2 of this part is a lot of land lying between No. 1 last above described, and land of the heirs of William Hemphill, deceased, having a front on the easterly side of Market street of twenty feet, and at that width ex-

tending back or eastwardly eighty feet three inches, to other land of part B., and having a two storied frame dwelling house and other buildings and improvements *thereon*, with a like privilege also of the alley as aforesaid."

Now it was alledged that by beginning No. 1 twenty-four feet from Market street, which is assumed to be the width of part B., which belongs as it is said to Mr. Wilson; and giving lot No. 1 a front of twenty feet seven inches, the dividing line between it and lot No. 2, is not between the frame house and the brick house, both described as being on these lots respectively; but runs through the frame house and cuts off from nine to fourteen inches.

This connects itself with the subsequent conveyance of these two lots, and affects the question whether these lots were conveyed by real boundaries or by course and distance only.

It was alledged by the plaintiff, that at the time of this assignment the parts of C. No. 1 and No. 2, were entirely distinct by visible holdings, and that the return of the freeholders had reference to the lines as defined by such holdings, being the walls of houses and other enduring land marks; and this was a fact for the consideration of the jury; that the conveyance by these assignees of C. No. 2 to Hemphill, in 1840, had the same reference as well as the description by course and distance; and that the subsequent conveyance by the same persons of C. No. 1 to Mrs. Stevens, in 1844, had the same reference to the visible lines, and must be taken to be restricted and defined by them.

If the facts were proved that these properties have for a long time been held by such visible and permanent lines; and being so held by the *same* persons, a part thereof, No. 2, was conveyed by reference to the assignment in the Orphans' Court, and a description of course and distance from Fifth street "being a lot or piece of land with a two storied frame dwelling house and other buildings and improvements thereon, situate;" the question of law then arose whether the subsequent conveyance by the same owners of the remaining house and lot C. No. 1, by a similar recognition and description, can give title to the second grantee, Mrs. Stevens, of a part, fourteen inches in width, of Miss Cling's house, by mere reference to the distance of both lots from Fifth street.

On this question it was the opinion of the court, that the course and distance of both these deeds from Way's assignees might be controlled by the actual visible lines marked out by such prominent and en-

during objects as the walls of houses or permanent fences; and if the lot of Miss Cling was so defined at the time of the assignment in the Orphans' Court, and had been so held for a long time previous, she has, as against Mrs. Stevens, a subsequent grantee of these assignees, a legal title to the house and lot as so held, though it should turn out upon measurement that forty-four feet seven inches from Fifth street would, by giving Mrs. Stevens a *full* front of twenty feet seven inches, overlap and cut off a small strip of the plaintiff's house. And this opinion is strengthened by the fact that the persons who owned both lots sold the first one by description refering to the house of Miss Cling, as being upon it; and afterwards sold the remaining lot to the defendant. The consequence of a different construction would, in a city, in case of an original mistake of any measurement from the street, or an accidental change of the starting point of measurement, throw the line of every lot in the square out of place; and though they might all have been held by the same person, and sold off *after* the houses were built, a rigid adherence to the required number of feet might require every wall on the street to be pulled down and removed, though but for a few inches.

We think, therefore, that the reference in these deeds to the houses then and long before built on the lots, will, as between two grantees from the same holder of both lots, and especially with reference to the Orphans' Court return, which does not give the distance from Fifth street, control the description in the deed by course and distance; and give to the plaintiff's landlord, the title to her house as it stood at the time of the conveyance.

Then as to the damages. If the plaintiff recovers, he will be entitled to damages in the discretion of the jury for the injury done him by the defendant's suffering her wall, unlawfully erected on a small part of his lot, to remain there since the last recovery. If the jury think her suffering the wall to remain there has not been from a wanton disregard of the plaintiff's rights, or disregard of his comfort and convenience; but has been for the proper purpose of again trying this question of title; it would not appear to be a case for aggravated damages. The plaintiff is merely a tenant, and not the owner of the property. The damages are to be assessed with reference to the injury done to his possession; and not for any injury done to the reversioner, Miss Cling, who is the owner of the place where the trespass is said to have been done. Yet this ques-

tion of damages is altogether in the discretion of the jury, dependent on the complaint stated in the declaration and the proof offered to support it.

Verdict for plaintiff.

*Mr. Bayard,* for plaintiff.
*Mr. Rogers,* for defendant.